UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| PATSY WIDAKUSWARA, JESSICA JERREAT, KATHRYN NEEPER, JOHN DOES 1-4, REPORTERS SANS FRONTIÈRES, REPORTERS WITHOUT BORDERS, INC., AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES (AFSCME), AMERICAN FEDERATION OF GOVERNMENT EMPLOYEES (AFGE), AMERICAN FOREIGN SERVICE ASSOCIATION (AFSA), and THE NEWSGUILD-CWA, | Index No. 25 Civ. 2390 **COMPLAINT** |

Plaintiffs,

-against-

KARI LAKE, in her official capacity as Senior Advisor to the Acting CEO of the U.S. Agency for Global Media; VICTOR MORALES, in his official capacity as Acting CEO of the U.S. Agency for Global Media; and U.S. AGENCY FOR GLOBAL MEDIA,

Defendants.

## INTRODUCTION

1.    Voice of America ("VOA"), a government-funded media outlet that is guaranteed editorial independence by statute, is just that: a journalistic "voice" that brings news, information, and the diversity of opinion, viewpoints, and focus that marks our great nation, to millions of people around the world. Or at least it *used to* do that. Just days ago, with the stroke of a pen, the new Administration silenced that voice. It halted VOA's iconic journalism by ordering virtually the entire staff not to report to work, turning off the service, and locking the agency's doors. It has done so because it perceives VOA's journalistic output to be inconsistent with this Administration's favored viewpoint and political agenda. And it has done so in direct violation of laws concerning the governance of VOA and its parent agency the United States

Agency for Global Media ("USAGM"), which ensure the ongoing availability of VOA and protect journalists from Executive Branch overreach, and the First Amendment.

2.    The Administration's wholesale dismantling of USAGM is happening in real time, with real-world impacts.  Prior to March 15, 2025, VOA and several networks funded through USAGM—Radio Free Europe/Radio Liberty ("RFE/RL"), Radio Free Asia ("RFA"), and others—had more than 425 million listeners every week.  Today, because of Defendants' actions, VOA has *no* listeners, and USAGM's grantee networks are being starved of the funds they need to maintain theirs.  Prior to March 15, 2025, more than 1,200 journalists, editors, engineers, and other personnel worked every day worldwide to produce and disseminate news, information, opinion and more to a global audience.  Today, because of Defendants' actions, there are virtually *no* workers performing their important public services, and USAGM produces *no* news, *no* opinion, *no* content at all.  Prior to March 15, 2025, Congress's statutory mandate that VOA continuously broadcast to the world had been honored and faithfully upheld for more than eight decades.  Today, for the first time in VOA's history, it is defied.

3.    Defendants are the acting CEO of USAGM, Victor Morales; the White House-appointed "Special Advisor" to USAGM, Kari Lake; and USAGM itself.  Their conduct, and the lawlessness and discriminatory animus that drives it, requires this Court to intervene.

4.    Sadly, if history teaches lessons, these latest abuses come as little surprise.  In 2020, the first Trump Administration—unhappy with the news coverage being disseminated by USAGM networks worldwide—sought to chill journalists in their newsgathering and expression and tear down the firewall insulating USAGM and its networks from partisan overreach.  That effort was stopped by a federal District Judge's grant of a preliminary injunction.  Today, the

second Trump Administration has taken a chainsaw to the agency as a whole in an attempt to shutter it completely.   The same judicial response—swift and definitive—is required.

5.    In the world at large, the vacuum left by Defendants pulling the plug on USAGM's news networks is being filled by propagandists whose messages will monopolize global airwaves, while VOA, Radio y Televisión Martì, RFE/RL, RFA, Middle East Broadcasting Networks ("MBN"), and others—credible voices to the contrary—are silenced.

6.    Defendants' actions are in direct violation of the law.  Section 6204(b) of Title 22 of the United States Code provides that the Chief Executive Officer of USAGM "shall respect the professional independence and integrity of" VOA and the other USAGM networks.  The firewall signifies that even though the networks are state *funded*, they are free, independent journalistic outlets designed to function like the most credible and reputable private news organizations in the  world.[1]

7.    Defendants have also acted contrary to Congress's express statutory requirement that USAGM exist as an independent news agency to present a reliable and objective news source to the world.  By statute, Congress created USAGM, VOA, the Office of Cuba Broadcasting, and USAGM grantee networks in order to ensure there are uncensored objective reporting sources internationally, including in markets where there is not a free and independent press.  Defendants have usurped Congressional power and acted arbitrarily in violation of the APA and *ultra vires* by shutting these news sources.  The disturbing result: In many parts of the

---

[1] Federal law also requires that the USAGM networks operate under ethical standards as credible and reputable news organizations.  Specifically, the International Broadcasting Act provides that USAGM networks must "conduct" themselves "in accordance with the highest professional standards of broadcast journalism."   22 U.S.C. § 6202(a)(5).   One such professional standard—a practice built into the fabric of every great media organization— requires a firewall between the newsroom and the publishers, codified in 22 U.S.C. §§ 6202, 6204(b).  The highest standards of professional journalism require journalism to be free of interference from an organization's business team.  Journalists must be free to write, report, publish, and broadcast stories about their outlet's sponsors, advertisers, and even publishers because the credibility of a news organization is essential to its business model.

world a crucial source of objective news is gone, and only censored state-sponsored news media is left to fill the void.

8.     Defendants have violated all of these laws by closing USAGM and ceasing altogether the business of gathering and disseminating news and opinion via VOA and its sister service Radio y Televisión Martí, as well as its grantee-affiliates RFE/RL, RFA, and MBN. Defendants' actions are unconstitutional and unlawful; they must cease immediately.

9.     Plaintiffs Widakuswara, Jerreat, and John Does 1-4 (collectively, the "VOA Journalists") are journalists—some full-time employees, others independent contractors (known as "personal service contractors" ("PSCs")) of USAGM—whom Defendants have purged from their positions by placing them on indefinite administrative leave ahead of likely Reduction in Force ("RIF") terminations or cancelling their contracts.  Defendants have subjected the VOA Journalists to these adverse actions because Defendants are opposed to the content of VOA's journalistic output—in short: rank viewpoint discrimination.  The VOA Journalists have devoted their careers to helping to build USAGM's networks into a credible media force with global audiences in the hundreds of millions.  They are dedicated public servants of the utmost integrity whom Defendants have maligned without basis as incompetent and, even worse, as "terrorist sympathizers."  What is happening to the VOA Journalists is not just the chilling of First Amendment speech; it is a government shutdown of journalism, a prior restraint that kills content before it can be created.

10.     Plaintiff Neeper is a Director at USAGM, where she manages the Offices of Policy and Research, Editorials, and Internet Freedom and oversees USAGM's strategic planning.

11.    Plaintiff Reporters Without Borders, Inc. ("RSF USA"), is the United States affiliate of Plaintiff Reporters Sans Frontières ("RSF"), an international non-profit and non-governmental organization that focuses on safeguarding the right to freedom of information. RSF has correspondents around the globe who rely on reporting from USAGM broadcasters, including VOA and USAGM's grantee networks.

12.    Plaintiffs AFSCME, AFGE, and AFSA (the "Federal Employee Union Plaintiffs") are labor organizations, voluntary membership associations who have each been certified by statute to represent certain USAGM employees.  Their interest in the welfare and protection of those they represent and their constitutional rights—including their rights to broadcast the news—mirrors that of their members, as described more fully below, and these unions have experienced additional injuries as organizations in their own right as well.

13.    Plaintiff The NewsGuild-CWA ("TNG-CWA") is a labor organization that does *not* represent federal employees but that *does* represent, as their exclusive collective bargaining agent, private sector employees of USAGM grantee station Radio Free Asia.  Like the Federal Employee Union Plaintiffs, TNG-CWA's interest in this case mirrors that of the employees TNG-CWA represents, which also includes tens of thousands of other media workers whose safety and interest in a free press worldwide have been put at substantial risk by the shuttering of USAGM.  And like the Federal Employee Union Plaintiffs, TNG-CWA has itself been injured.

14.    If VOA and the other USAGM networks are to survive, this Court must act.  It must recognize and protect, as the court did in *Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333 (D.D.C. 2020), the rights of journalists and those who assist them to work and produce content free from partisan interference by the Executive Branch—including the "interference" inherent in being locked out of their offices, computer networks, email accounts,

and broadcast studios, and living under the threat of termination.  It must enforce the firewall in the way Congress wrote it.  And it must uphold the foundational principles of Congressional authority, appropriations, and separation of powers that are set forth in the Constitution and laws of the United States, and which prevent the Executive Branch from dismantling by decree an agency created and mandated by Congress, as a court recognized earlier this week when it blocked a similar shuttering of USAID.  *See* Mar. 18, 2025 Order, Dkt. 75, *J. Does 1-26 v. Elon Musk,* No. 25-cv-00462 (D. Md. ).

## JURISDICTION AND VENUE

15.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 28 U.S.C. § 1343 (action to redress deprivation of rights secured by the Constitution of the United States).

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1).  A substantial part of the events giving rise to the claims herein occurred in this District, Defendants are officers of the United States sued in their official capacities, and Plaintiffs John Doe 1 and John Doe 2 reside in this District.

## PARTIES

17.    Plaintiff Patsy Widakuswara is the VOA White House Bureau Chief.  She has covered the White House for VOA since 2018.  An award-winning journalist with 30 years of experience, Plaintiff Widakuswara joined VOA in 2003.  She is a resident of the District of Columbia and a full-time equivalent federal employee ("FTE") of VOA.

18.    Plaintiff Jessica Jerreat is the VOA Press Freedom Editor.  She joined VOA in 2020.  Plaintiff Jerreat is an award-winning journalist with nearly 25 years of experience in media organizations in London, New York, and Washington, D.C.  As VOA's Press Freedom Editor, she oversees and exercises editorial discretion with respect to the Press Freedom Desk,

which covers attacks, threats, and harassment of journalists across the globe.  Plaintiff Jerreat is a resident of Virginia and an FTE of VOA.

19.    Plaintiff Kathryn Neeper is the Director of Strategy and Performance Assessment at USAGM, where she manages the Offices of Policy and Research, Editorials, and Internet Freedom, and oversees USAGM's strategic planning, performance reporting, research, data analytics, and interagency outreach.  Plaintiff Neeper joined USAGM's predecessor agency, the Broadcasting Board of Governors, in 2008.  She is a resident of the District of Columbia and an FTE of USAGM.

20.    Plaintiff John Doe 1 is a journalist at VOA and an FTE of VOA.  Plaintiff John Doe 1 has over 15 years of journalism experience and works at VOA's New York bureau. Plaintiff John Doe 1 is a resident of New York County, New York.

21.    Plaintiff John Doe 2 is a journalist at VOA and an FTE of VOA.  Plaintiff John Doe 2 joined VOA over 15 years ago.  Plaintiff John Doe resides in New York County, New York.

22.    Plaintiff John Doe 3 is a PSC, i.e., an independent freelance journalist, working under a contract with VOA.  John Doe 3 has worked at VOA as a journalist for more than two years.  John Doe 3 is also a foreign national who is authorized to work for VOA in the United States under a J-1 visa.  If Plaintiff John Doe 3's visa is not renewed as a result of USAGM being shuttered, John Doe 3's visa will expire on March 31, 2025.  Upon expiration, John Doe 3 must return to John Doe 3's home country, which is governed by an authoritarian regime that has labeled VOA a subversive organization.  John Doe 3 risks imprisonment for 15 years on charges of spreading "false information" for reporting about John Doe 3's home country at VOA.  John Doe 3 is a resident of the District of Columbia.

23.     John Doe 4 is a PSC, i.e., an independent freelance journalist, working under a contract with VOA.  John Doe 4 is a foreign national who is authorized to work for VOA in the United States under a J-1 visa.  If Plaintiff John Doe 4's visa is not renewed as a result of USAGM being shuttered, John Doe 4's visa will expire on March 31, 2025.  John Doe 4 is a member of the LGBTQ community and is from a home country which persecutes and discriminates against LGBTQ people.  John Doe 4 is a resident of Queens County, New York.

24.     Plaintiff Reporters Without Borders, Inc. ("RSF USA") is a 501(c)(3) non-profit organization headquartered in Washington, D.C., and is the United States affiliate of Plaintiff Reporters Sans Frontières ("RSF"), which is headquartered in Paris, France.  RSF and RSF USA's mission is to monitor press freedom violations, raises awareness, advocates for policies supporting access to information, expose bad actors, and mobilize the public with respect to press freedom issues.  RSF has 130 correspondents who are media workers throughout the world, and RSF USA oversees RSF correspondents who work in English-speaking North America.  RSF and RSF USA's media workers routinely rely on VOA as an indispensable source of information.  RSF and RSF USA bring suit on behalf of themselves and their members.

25.     Plaintiff American Federation of State, County and Municipal Employees, AFL-CIO ("AFSCME") is a national labor organization and unincorporated membership association headquartered at 1625 L Street, N.W., Washington, D.C. 20036. AFSCME is the largest trade union of public employees in the United States, with around 1.4 million members organized into approximately 3,400 local unions, 58 councils and other affiliates in 46 states, the District of Columbia and Puerto Rico.  AFSCME, through its subordinate body AFSCME Council 20 and constituent local unions, represents federal civilian employees in agencies and departments across the federal government.

26.     Among the AFSCME local unions representing federal employees is AFSCME Local 1418, which represents a collective bargaining unit of USAGM employees who work on VOA programming.  AFSCME Local 1418 is party to a collective bargaining agreement with USAGM that is applicable, by its terms, to "all non-supervisory Radio Broadcast Technicians ("RBTs") employed by USAGM in the Radio Master Control" and "Radio Studios" in Washington, D.C., as well as those "assigned to the New York News Bureau" in New York City, New York.  Currently, all members of the bargaining unit work in Washington, D.C. Some bargaining unit members have been in the past, and may also be periodically in the future pursuant to the collective bargaining agreement, assigned to the New York News Bureau, which mainly covers the United Nations, when the bureau there produces radio programing. Regardless of their duty station, these employees are responsible for producing and engineering live broadcasts of radio programming by running the mixing console, and they are essential employees vital to maintaining uninterrupted broadcasting operations.

27.     Plaintiff American Federation of Government Employees, AFL-CIO ("AFGE") is a labor organization and unincorporated association headquartered in Washington, D.C.  AFGE is the largest federal employee union, representing approximately 800,000 federal civilian employees through its affiliated councils and locals.  Through its affiliate AFGE Local 1812, AFGE represents nearly 900 employees at USAGM, including employees of VOA and Cuba Broadcasting.  AFGE Local 1812 is party to a collective bargaining agreement with USAGM that covers all "professional and non-professional" General Schedule and Wage System employees of USAGM except radio broadcast technicians and Foreign Service employees. Members of the AFGE Local 1812 bargaining unit work in both Washington, D.C. and New York, New York.  Employees represented by AFGE Local 1812 include journalists, broadcast

production specialists, and administrative support staff. These employees are essential to the continued functioning of USAGM, including its broadcasting operations.

28.     Plaintiff American Foreign Service Association ("AFSA") is the professional association and labor organization headquartered at 2101 E Street, NW, Washington, DC 20037. AFSA is the sole and exclusive labor organization for the U.S. Foreign Service. AFSA represents nearly 80 percent of active-duty members of the Foreign Service across six foreign affairs agencies, including the USAGM. AFSA represents 16 Foreign Service USAGM employees who work in Washington, DC and overseas.

29.     AFSA exists to support the United States Foreign Service, which deploys worldwide to protect and serve America's people, interests, and values. AFSA is both the principal advocate for the long-term institutional wellbeing of the professional career Foreign Service and responsible for safeguarding the interests of AFSA members. Membership in AFSA is voluntary. AFSA leadership is democratically elected by and from its members. The activities of AFSA are funded by its members through voluntary membership dues.

30.     Plaintiff The NewsGuild-CWA, AFL-CIO ("TNG-CWA"), is a labor union representing more than 27,000 employees—none of whom are federal employees. TNG-CWA is the largest labor union representing journalists and media workers in North America. TNG-CWA represents a bargaining unit of about 100 employees of RFA, a news service that provides news, analysis, commentary, and cultural programming to a weekly audience of nearly 60 million who lack access to a free press or live in media environments vulnerable to authoritarian disinformation. RFA is a private, nonprofit corporation, funded by the U.S. Congress through an annual grant from USAGM. TNG-CWA, through its local union, the Washington-Baltimore News Guild, and RFA are signatories to a private-sector collective bargaining agreement

("CBA"), governed by the National Labor Relations Act (NLRA), which governs wages, benefits, and other terms and conditions of employment and runs through December 31, 2025. Under the CBA, TNG-CWA is recognized as the exclusive collective bargaining agent of all non-supervisory full-time and regular part-time language service employees of RFA, including but not limited to journalists.

31. Maintaining a free and independent press is fundamental to the journalistic profession—TNG-CWA members simply cannot do their jobs without it, and the promotion of freedom of the press worldwide is a core part of TNG-CWA's mission. Article I of the TNG-CWA Constitution, titled "Name and Object," includes in its mission "to improve the working conditions of its members; to guarantee . . . constant honesty in news, editorials, advertising, and business practices; [and] to raise the standards of journalism and ethics of the industry." USAGM programs, including but not limited to RFA, further TNG-CWA's fundamental organizational mission by (1) improving its members' working conditions abroad by promoting free press in the countries where members travel to report the news; (2) protecting their safety in those countries by allowing for the free flow of information into countries otherwise beset with government censorship; and (3) promoting the value of free press more generally, which is an essential baseline condition for TNG-CWA members to do their jobs, in the U.S. and around the world.

32. Defendant USAGM is an independent agency that supports federally funded broadcast networks, including VOA, the Office of Cuba Broadcasting, RFA, RFE/RL, and the MBN. USAGM networks broadcast in 62 languages and reach a cumulative weekly audience of 425 million people in more than 100 countries. They produce more than 3,000 hours of original

programming each week.  The agency's annual budget is over $800 million for the current fiscal

year. USAGM is headquartered in the District of Columbia.

33.     Defendant Kari Lake is the White-House appointed "Special Adviser" to

USAGM.  Ms. Lake claims to be acting under authority delegated to her by Defendant Morales,

the acting USAGM Chief Executive Officer.  Defendant Lake is sued in her official capacity.

34.     Defendant Victor Morales is the Acting Chief Executive Officer of USAGM.  As

the Acting CEO of USAGM, Defendant Morales supervises all activities relating to USAGM

broadcasting.  *See* 22 U.S.C. § 6204(a).

## JURY DEMAND

35.     Plaintiffs hereby demand a jury trial as to all matters properly triable by jury.

## FACTUAL ALLEGATIONS

## I.    AMERICAN BROADCASTING HAS LONG BEEN INSULATED FROM POLITICAL AND GOVERNMENT INTERFERENCE TO ENSURE ITS INTEGRITY AND JOURNALISTIC INDEPENDENCE.

36.     Government-funded journalism, reporting, and broadcasting have been a central

component of the United States' efforts to combat disinformation and propaganda abroad since

World War II.  Initially, U.S. government-funded international broadcasting provided news to

German audiences as a counterpoint to Nazi propaganda.  From there, coverage expanded to

Eastern Europe and the Soviet Union during the Cold War, and later to Cuba, Asia, and the

Middle East.  For the past eight decades, U.S. government-funded international broadcasting has

served millions of people around the world, especially in countries where governments prohibit

access to a free press and freedom of information.  Today, some of American broadcasting's

biggest audiences are in North Korea, Iran, and China, where millions of people seek credible,

impartial news uninfluenced by government agenda or politics.  American government-funded

broadcasting services have played key roles in foreign policy by providing truthful information

about local and world repressive regimes that otherwise suppress or censor the press.  The global

public's trust in the accuracy of reporting from these organizations is paramount to the success of

their mission.

37.     Congress has recognized that "[a]lthough VOA correspondents are on the federal

payroll, they are unique in that ***they are working journalists***.  Accordingly, their independent

decisions on when and where to cover the news should not be governed by other considerations."

H.R. Conference Report 107–671 (to accompany H.R. 1646), Sept 22, 2002 (emphasis added).

USAGM's mission is "to inform, engage, and connect people around the world in support of

freedom and democracy."

***Development of Structure as Independent Agency***

38.     United States international broadcast has, in one iteration or another, been a

statutorily mandated government function since 1973. *See* Board for International Broadcasting

Act of 1973 (BIB Act), Pub. L. No. 93-129, 87 Stat. 456 (1973). In the 1973 BIB Act, Congress

codified the United States' policy "to promote the right of freedom of opinion and expression"

via "open communication of information and ideas among the peoples of the world." 87 Stat.

457.  Through the Act, Congress created the Board for International Broadcasting, an

independent federal agency consisting of a seven-member bipartisan board, five of whom were

Senate-confirmed. 87 Stat. 456 § 3; *see also* Matthew C. Weed, Cong. Rsch. Serv., R43521, U.S.

International Broadcasting: Background and Issues for Reform (CRS Int'l Broadcasting Rep.) 3

(2016).  The Board oversaw and funded Radio Free Europe and Radio Liberty from 1973 until

1994.  87 Stat. 457-58.

39.     In 1994, Congress created the United States Information Agency Broadcasting

Board of Governors.  *See* International Broadcasting Act of 1994 ("IBA"), Pub. L. 103-236, 108

Stat. 432, 434 § 304.

40.     The IBA articulated American policy as promoting "the right of freedom of

opinion and expression, including the freedom 'to seek, receive, and impart information and

ideas through any media and regardless of frontiers,' in accordance with Article 19 of the

Universal Declaration of Human Rights."   IBA § 302(1).

41.     The IBA created the Broadcasting Board specifically to establish a firewall

between the U.S. government and the government-funded broadcasting services that make

journalistic and editorial decisions.   The Broadcasting Board had nine bipartisan members who

were statutorily required to enforce and protect the firewall that existed between the government

and the journalists.   *See* IBA § 305(c) (articulating the existence of a firewall between anyone

involved with any aspect of journalism (*e.g.*, the creation, editing, reporting, distributing, etc. of

content) and everyone else in the government).

42.     The Act also established standards and principles governing United States

international broadcasting, which remain in place today.  *Id*. § 303; 22 U.S.C. § 6202(a), (b).

Those standards and principles mandate that U.S. international broadcasting *shall* meet eight

standards and ten principles, including that U.S. international broadcasting "be designed so as to

effectively reach a significant audience," and "include news which is consistently reliable and

authoritative, accurate, objective, and comprehensive."  *Id*. § 6202(a)(7), (b)(1).

43.     In 2017, the National Defense Authorization Act established USAGM's current

organizational structure. National Defense Authorization Act of 2017 ("NDAA"), PL 114-328,

130 Stat 2000, 2549 § 1288.[2]  USAGM remains an independent agency in the executive branch.

22 U.S.C. § 6203(a); 5 U.S.C. § 104.  A Chief Executive Officer who is appointed by the

President and confirmed by the Senate heads the agency, including by supervising broadcast

activities, with due regard for the professional independence of its news services.  22 U.S.C.

§§ 6203, 6204(a)(1), (b).  The NDAA retained a broadcasting board, but converted it into an

advisory board, consisting of seven Senate-confirmed members and the Secretary of State.  22

U.S.C. § 6205(b).

44.     The 2017 NDAA explicitly reaffirmed that the decades-old statutory firewall

exists between the USAGM networks and applies to the CEO.   Specifically, the statute provided

that "[t]he Secretary of State and the Chief Executive Officer, in carrying out their functions,

***shall respect the professional independence and integrity of the Agency, its broadcasting***

***services, and the grantees of the Agency.***"   22 U.S.C. § 6204(b) (emphasis added); *accord*

*Turner*, 502 F. Supp. 3d at 346.   In his signing statement, then-President Obama made clear that

the statute "'retain[ed] the longstanding statutory firewall, protecting against interference with

and maintaining the professional independence of the agency's journalists and broadcasters and

thus their credibility as sources of independent news and information.'"   *Open Technology Fund*

*v. Pack*, 470 F. Supp. 3d 8, 14 (D.D.C 2020) (quoting President Obama's Statement on Signing

the National Defense Authorization Act for Fiscal Year 2017, 2016 DAILY COMP. PRES. Doc.

863, at 3 (Dec. 23, 2016)).

---

[2] In the NDAA, the agency was still called the Broadcasting Board of Governors. 130 Stat 2549.  In 2018, the USAGM's Chief Executive Officer exercised statutory authority to change the name of the BBG to the United States Agency for Global Media.  *See Firewall and Highest Standards of Professional Journalism*, 85 Fed. Reg. 36150 (2020); 22 U.S.C. § 6204(a)(21) (authority to change name).

### *The Full-Year Continuing Appropriations and Extensions Act, 2025*

45.     For Fiscal Year 2025, Congress has, through a series of Continuing Resolutions, appropriated $857,214,000 for USAGM to carry out international communication activities.  In particular, in three continuing resolutions covering Fiscal Year 2025, Congress funded USAGM at the same levels, and subject to the same conditions, as it funded USAGM in Fiscal Year 2024. *See* Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 118-83, div. A, § 101(11), 138 Stat. 1524–25 (2024) ("First Continuing Resolution") (appropriating funds as provided in certain FY2024 appropriations laws and making them available through December 20, 2024); American Relief Act, 2025, Pub. L. No. 118-158, 138 Stat. 1722 (2024) ("Second Continuing Resolution") (extending funding through March 14, 2025); Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101 (2025) ("Third Continuing Resolution") (extending funding through September 30, 2025).  Most relevant here, effective March 15, 2025, Congress enacted the Fully-Year Continuing Appropriations and Extensions Act, 2025, which appropriated amounts at the levels specified in, and "under the authority and conditions provided in," the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (division F of Public Law 118–47) ("2024 Appropriations Act"). Pub. L. No. 119-4, div. A, § 1101 (2025).  That funding extends through at least September 30, 2025.

46.     The 2024 Appropriations Act—which the current continuing resolution Act adopts by reference—mandates how the $857,214,000 in appropriated funds "*shall be allocated*." Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735 (2024) (emphasis added).  For instance, $260,032,000 must go to VOA; $142,212,000 must go to RFE/RL; and $60,830,000 must go to RFA. *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735 (2024)

(requiring funds to be allocated in accordance with table in "the explanatory statement" described in section 4"); id. § 4 (identifying explanatory statement); Explanatory Statement Submitted by Ms. Granger, Chair of the House Committee on Appropriations, Regarding H.R. 2882, Further Consolidated Appropriations Act, 2024, 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024) (setting forth table designating how funds appropriated for international broadcasting "are allocated").

47.     Under the appropriations acts, USAGM may to some extent reprogram funds among different programs, but only if it gives the House and Senate Appropriations Committees 15 days' advance notice.  2024 Appropriations Act, div. F, tit. I, 138 Stat. 735; *see* 170 Cong. Rec. at H2087. And in no event may any reprogramming reduce funding for a program by more than 5 percent of what Congress designated.  *Id.*

48.     Nothing gives USAGM the authority to shut itself down notwithstanding Congress's decision to create the agency and provide it with funding. Indeed, Congress even placed limits on USAGM's (and other agencies') ability to shut down more discrete items.  The agency cannot suspend or eliminate any "program, project, or activity," and it cannot close or downsize any "bureaus, centers, or offices," unless it gives the congressional appropriations committees at least 15 days' advance notice.  2024 Appropriations Act, div. F, Sec. 7015, 138 Stat. 766.

***Statutorily Mandated Broadcasts***

49.     USAGM, which is required to exist by law, also has numerous mandatory statutory functions.

50.     Voice of America: VOA, now part of the USAGM, has been broadcasting under Congressionally approved statutory authority since 1948.  The U.S. Information and Exchange Act, also known as the Smith-Mundt Act, authorized VOA's international broadcasting. U.S.

Information and Exchange Act of 1948, Pub. L. 80-402, 62 Stat. 6 § 502 (1948).  In 1977, the Foreign Relations Authorization Act of 1977 converted VOA into a mandatory government service. Pub. L. 94-350, 90 Stat. 823 § 206.  It codified VOA's charter, still in place today, which mandates that "Voice of America *must win* the attention and respect of listeners." 22 U.S.C. § 6202(c).  To do so: "(1) VOA *will serve* as a consistently reliable and authoritative source of news. VOA news will be accurate, objective, and comprehensive. (2) VOA *will represent* America, not any single segment of American society, and will therefore present a balanced and comprehensive projection of significant American thought and institutions. (3) VOA *will present* the policies of the United States clearly and effectively, and will also present responsible discussions and opinion on these policies." *Id*. (emphasis added).

51.    The statute provided that VOA serves "[t]he long-range interests of the United States" and noted that "[t]o be effective, the Voice of America must win the *attention and respect of listeners*."  22 U.S.C. § 6202(c) (emphasis added).

52.    <u>Radio and Television Broadcasting to Cuba</u>: In 1983, Congress passed the Radio Broadcasting to Cuba Act, Pub. L. 98-111, 97 Stat. 749 (1983).  Through that Act, Congress declared its view that it "would be in the national interest" to broadcast to Cuba "news, commentary and other information about events in Cuba and elsewhere to promote the cause of freedom in Cuba." 97 Stat. 749 § 2; 22 U.S.C. § 1465.  It therefore mandated that the then-U.S. Information Agency (now USAGM) "shall provide for the open communication of information and ideas through the use of radio broadcasting to Cuba."  Pub. L. 98-111 § 3; 22 U.S.C. § 1465a.  In 1990, Congress extended this mandate to television broadcasting via the Television Broadcasting to Cuba Act, Pub. L. 101-246, 104 Stat. 15 § 241; 22 U.S.C. § 1465aa et seq.

53.    <u>Programming Mandates</u>: Congress has also legislated precise programming

mandates that Voice of America is required to carry out alongside USAGM grantees. 22 U.S.C.

§ 7813 requires USAGM to "increase" broadcasts to North Korea and maintain "a goal of

providing 12-hour-per-day broadcasting to North Korea, including broadcasts by Radio Free

Asia and Voice of America." And 22 U.S.C. § 8754(7)(A) requires USAGM by way of Voice of

America's Persian News Network and RFE/RL "to provide hourly live news update

programming and breaking news coverage capability 24 hours a day and 7 days a week" in Iran.

54.    <u>Other USAGM Statutorily Mandated Functions</u>: USAGM is also required by

statute to fund specific foreign broadcast entities via grants: RFE/RL; RFA; MBN; and the Open

Technology Fund. *See* 22 U.S.C. §§ 6204(a)(5), (6), 6207(f), 6208, 6215. USAGM has

acknowledged that these provisions "dictate how the CEO must exercise his § 6204 grant-

making authority when dealing with" named grantees. Def.'s Opp. to Pls.' Mot. TRO, at 4,

*Open Technology Fund v. Pack*, No. 20-cv-1710, ECF 7, 2020 WL 7041426 (D.D.C. filed June

26, 2020).

## II.    ANIMUS TOWARDS VOA DURING THE FIRST TRUMP ADMINISTRATION

55.    President Trump demonstrated his animus towards USAGM in his first term. In

April 2020, the President called VOA "the Voice of the Soviet Union." He asserted that VOA

was saying "disgusting [things] toward our country," and was "parroting Chinese talking points

during its coronavirus coverage." The White House later issued a statement that "VOA too often

speaks for America's adversaries—not its citizens. Journalists should report the facts, but VOA

has instead amplified Beijing's propaganda." President Trump accused VOA of "spend[ing

America's] money to promote foreign propaganda" "amid a pandemic." He called VOA a

"DISGRACE" and accused it of peddling Chinese and Iranian "propaganda."

56.     In June 2020, the First Trump Administration began to aggressively assert control over USAGM.   The Administration's goal was to fundamentally remake USAGM into the Administration's public relations outlet.   To accomplish this, the First Trump Administration breached the statutory firewall, attempted to cow journalists into submission, and sought to chill any expressive conduct that they deemed out of lockstep with the administration.

57.     The result was a lawsuit brought by VOA journalists employed by USAGM—*Turner v. U.S. Agency for Global Media*.  In *Turner*, United States District Judge Beryl Howell of the District of the District of Columbia held that USAGM/VOA journalists enjoy a First Amendment and firewall-based right to free speech that can be enforced in federal court.  The Court in *Turner* preliminarily enjoined USAGM officials from taking certain actions in derogation of USAGM journalists' rights.  *See generally Turner v. U.S. Agency for Global Media*, 502 F. Supp. 3d 333 (D.D.C. 2020).

58.     Donald J. Trump left office on January 20, 2021.

## III.    ANIMUS TOWARDS VOA SINCE THE 2024 ELECTION

59.     In his second term, like in his first, President Trump, his administration and his advisors—including Defendant Lake—have demonstrated animus towards USAGM, VOA, and its journalists based on the content of their reporting.

60.     Even before his second inauguration, President Trump announced his intention to target VOA based on the contents of its journalistic output.

61.     In a December 11, 2024 posting on Truth Social, Defendant Donald Trump announced his intention to appoint Defendant Kari Lake as director of VOA, making clear he did not approve of its editorial decisions: "I am pleased to announce that Kari Lake will serve as our next Director of the Voice of America. She will be appointed by, and work closely with, our next head of the U.S. Agency for Global Media, who I will announce soon, to ensure that the

American values of Freedom and Liberty are broadcast around the World FAIRLY and ACCURATELY, unlike the lies spread by the Fake News Media."[3]

62.     Newly inaugurated for second term, President Trump appointed Elon Musk, a private citizen, "head" of the newly formed Department of Government Efficiency.  In that role, Musk has a presidential mandate (although not a legal one) to radically diminish or eliminate federal agencies.  On February 9, 2025, Elon Musk posted on X (formerly Twitter) to "shut them down," referring to VOA and Radio Free Europe.  Musk described the workforce at VOA as "just radical left crazy people talking to themselves while torching" taxpayer money.[4]

63.     Trump's plan to appoint Defendant Lake as VOA director was stymied by the President's own conduct.  Shortly after taking office, President Trump fired all members of the USAGM Advisory Board.  Because the heads of USAGM's broadcast programs, including VOA, "may only be appointed or removed if such action has been approved by a majority vote of the Advisory Board," 22 U.S.C. § 6205(e)(1), Lake could not assume control of VOA or become Director of VOA.  Pivoting, Trump named Lake "special adviser" to USAGM; she was "sworn in" on March 3, 2025.  That same day, Lake announced that USAGM employee Defendant Victor Morales would serve as acting CEO.

64.     On March 6, 2025, USAGM staff received an email from "House Announcements" asking them to send their personal email address and phone number to "HRCustomerService@usagm.gov."  The email cited the need to communicate with employees

---

[3] Donald J. Trump (@realDonaldTrump), Truth Social (Dec. 11, 2024),
https://truthsocial.com/@realDonaldTrump/posts/113637437665057869.

[4] Elon Musk (@elonmusk), X (Feb. 9, 2025), https://x.com/elonmusk/status/1888574212316582230.

"when email access may be limited" "[a]s restructuring, reductions in force (RIFs), and other working changes continue across the federal government."

65.    On March 12, 2025, during a meeting in the Oval Office, VOA White House bureau chief Patsy Widakuswara asked the visiting Irish Prime Minister about President Trump's plan to expel Palestinians from Gaza.  President Trump asked the reporter what outlet she was with, and when she responded with "I'm with Voice of America, Sir," President Trump scoffed guffawed and said, "Oh, no wonder."[5]

66.    On March 13, 2025, Defendant Lake posted on X that she "moved today to cancel expensive and unnecessary newswire contracts" for USAGM.

67.    That same day, a TNG-CWA member at RFA received confirmation from RFA's Executive Editor that USAGM had cut RFA's wire services contracts with the Associated Press and Agence France-Presse—which are an essential tool for journalists that provide the right to republish news produced by hundreds of journalists from those newsrooms.

68.    The next day, March 14, 2025, Defendant Morales sent an email notifying USAGM staff of the contract terminations.

69.    Also on March 14, President Trump signed an Executive Order entitled "Continuing the Reduction of the Federal Bureaucracy" concerning the future of USAGM and other agencies. Exec. Order No. 14238, 90 Fed. Reg. 13043 (Mar. 14, 2025) (the "USAGM Executive Order").  The USAGM Executive Order provides that USAGM and six other federal entities "shall be eliminated to the maximum extent consistent with applicable law, and such entities shall reduce the performance of their statutory functions and associated personnel to the

---

[5] Diario AS, "Trump SHUTS DOWN reporter over GAZA question: 'OH, NO WONDER,'" YouTube (Mar. 13, 2025), https://www.youtube.com/watch?v=Yxer4gZUmOw.

minimum presence and function required by law."[6]  USAGM Executive Order § 2(a).  It also

required the head of USAGM to submit to the director of the Office of Management and Budget

a report "confirming full compliance with [the] order and explaining which components or

functions of the governmental entity, if any, are statutorily required and to what extent."

USAGM Executive Order § 2(b).

70.    The USAGM Executive Order was issued simultaneously with a March 14, 2015

"article" entitled "The Voice of Radical America," (the "VORA Statement") which was

published on WhiteHouse.gov.  The VORA Statement laid bare the Administration's motives for

effectively "eliminat[ing]" the USAGM.[7]

71.    According to the VORA Statement, the purpose of the USAGM Executive Order

was to end taxpayer support for what the statement called "radical propaganda."  It read in

pertinent part: "President Donald J. Trump's executive order on Friday will ensure that taxpayers

are no longer on the hook for radical propaganda."

72.    Quoting Dan Robinson, a former White House correspondent, the VORA

Statement asserted that VOA's journalism "reflect[s] a leftist bias aligned with partisan national

media."

73.    The VORA Statement listed examples of the claim of "leftist bias."  These

included claims that VOA "downplay[ed] the validity of the Hunter Biden laptop story" and was

"too favorable to presumptive Democratic nominee Joe Biden."  It also cited a VOA story about

---

[6] *Continuing the Reduction of the Federal Bureaucracy*, The White House (Mar. 14, 2025),
https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/.

[7] *The Voice of Radical America*, The White House (Mar. 15, 2025),
https://www.whitehouse.gov/articles/2025/03/the-voice-of-radical-america/.

"white privilege and racial profiling" and a "segment about transgender migrants seeking asylum in the United States."

## IV.    DEFENDANTS EFFECTIVELY SHUT DOWN USAGM DUE TO ADMITTED ANIMUS TOWARDS ITS EDITORIAL CONTENT

74.    The next day, March 15, 2025, journalists and other VOA employees were emailed by Crystal Thomas, the Director of USAGM HR.  The email informed all VOA employees that "effective immediately" they were all being placed on administrative leave.  The email stated that the leave was not for any "disciplinary purpose."

75.    Approximately 1,300 VOA journalists and other employees, including all AFSCME-represented RBTs and most AFGE-represented employees, had to stop working immediately because they were placed on administrative leave.  Certain contractors were terminated.[8]

76.    For example, on March 15, 2025, several RBTs represented by AFSCME were at the VOA offices working on weekend programing, because Master Control RBTs are required to be present in-person to broadcast programming such that bargaining unit members are on-site 24/7.  These members were told by their supervisors to finish their live broadcasts and then to vacate the building because they needed to clear the building out.  At approximately 5:00 p.m. on the same day, bargaining unit members lost access to USAGM systems, including email.

77.    Similarly, several journalists represented by AFGE were told to end their broadcasts and vacate their duty stations, and lost access to USAGM systems.

78.    USAGM, through Defendant Lake, also terminated grant agreements that are statutorily mandated, including the grant agreements that fund RFE/RL and RFA.  In the

---

[8] Liam Scott, *The Last Days at Voice of America*, Columbia Journalism Review (Mar. 18, 2025), https://www.cjr.org/first_person/last-days-voice-of-america-voa-trump-kari-lake.php.

termination letter to RFE/RL, Lake claimed that funding the entity "no longer effectuates agency priorities." Complaint ¶ 3, *RFE/RL, Inc. v. Lake*, No. 1:25-cv-799, Dkt. 1 (D.D.C. Mar. 18, 2025).

79.    On March 15, 2025, RFA's President issued a statement that "[t]he termination of RFA's grant is a reward to dictators and despots, including the Chinese Communist Party, who would like nothing better than to have their influence go unchecked in the information space. RFA has been foundational in helping U.S. policymakers understand the reality of what's happening in China and other closed countries, bringing transparency and accountability where there is none . . . . Today's notice not only disenfranchises the nearly 60 million people who turn to RFA's reporting on a weekly basis to learn the truth, but it also benefits America's adversaries at our own expense."

80.    On March 19, 2025, RFA employees received notices stating 75 percent of the U.S. based staff would be placed on unpaid furloughs starting on Friday, March 21, 2025, which is the furloughed employees' last day of pay. RFA's human resources department notified employees on March 19, 2025, who would be subject to furlough. RFA management asked TNG-CWA for the ability to determine which employees will be furloughed. RFA did not indicate how long the furlough will last, but RFA stated that health insurance and other benefits like life insurance, disability, dental and vision will only be maintained through the end of April 2025, after which RFA will inform furloughed employees of any changes. RFA has, however, already provided employees with information on how to obtain healthcare coverage in anticipation of employees losing health insurance after April 2025.

81.    Meanwhile, USAGM employees on administrative leave were not permitted to enter VOA's office or access their VOA email or computer networks. They were instructed to

"immediately surrender" their "official USAGM identification badge . . . electronic and telephone devices, and other equipment."  That same evening, USAGM Foreign Service employees assigned overseas received a second message noting that their administrative leave status had been lifted.  No additional information or explanation was provided.

82.     As a result of Defendants' actions, VOA is no longer reporting the news.  Its website has not been updated since March 15, 2025, with the website headlining now out-of-date articles.  It is no longer broadcasting content.  Radio stations abroad that rely on VOA's programming went dark or began airing nothing but music.

83.     On Monday, March 17, 2025, during a meeting led by William Martin, Director for Stations and Operations, all USAGM Foreign Service employees were instructed to: (1) shut down all transmitters at their respective stations within two days, (2) request the Mission to place all locally employed staff on administrative leave, and (3) expect to be placed back on administrative leave after a two-day shutdown period.

84.     USAGM Senior Advisor Kari Lake described the actions USAGM was taking under her direction to "dramatically downsize" in a March 15, 2025 statement published on the USAGM website (the "March 15 Statement").[9]

85.     In the March 15 Statement, Ms. Lake announced that implementation of the USAGM Executive Order meant the effective elimination of USAGM.   The "agency is not salvageable," Lake said.  "USAGM and the outlets it oversees will be reduced to their statutory functions and associated personnel will be reduced to the minimum presence and function required by law.  This action will impact the agency's workforce at USAGM, VOA, Office of

---

[9] *USAGM, Senior Advisor Kari Lake cancels obscenely expensive 15-year-lease that burdened the taxpayers and enforces Trump's Executive Order to drastically downsize agency*, U.S. Agency for Global Media (Mar. 15, 2025), https://www.usagm.gov/2025/03/15/u-s-agency-for-global-media-complies-with-presidential-executive-order-to-reduce-the-federal-bureaucracy/.

Cuba Broadcasting, and all Grantees. Most USAGM staff affected by this action will be placed on paid administrative leave beginning Saturday, March 15, 2025, and remain on leave until further notice."

86.    In the March 15 Statement, Ms. Lake described the content of USAGM's journalism as "a product that often parrots the talking-points of America's adversaries."  This was listed as one of the so-called "egregious findings" establishing that the agency is "not salvageable."

87.    Ms. Lake then appeared on "Bannon's War Room" in a program that aired on March 17, 2025 (the "Bannon Interview").[10]  In the Bannon Interview, Ms. Lake stated that, because it would take a "long, long time" for the Senate to advise and consent to President Trump's appointments to the International Broadcasting Advisory Board, which governs USAGM, the President appointed her as a Senior Advisor over the agency.

88.    In the Bannon Interview, Ms. Lake described the journalism USAGM produces as not "pro-American" and called the agency a "propaganda arm."   She characterized USAGM as "important for the Deep State" and offered that rationale as a reason why the agency needed to be effectively eliminated.

89.    In the Bannon Interview, Ms. Lake described the actions she had taken on March 15 to shutter the agency as merely a first step.  She stated that what's "coming up next" is that the agency "is going to be decreased in size significantly" because there is "too much rot in the agency to salvage it."  The next step will be to "slim[ the] agency down, way down" and put it on an "Ozempic diet."

---

[10] Bannon's War Room, *"It Is Full of Waste, Fraud, And Abuse." Kari Lake Reacts To 1,300 Voice Of America Layoffs*, Rumble (Mar. 17, 2025), https://rumble.com/v6qs70g-it-is-full-of-waste-fraud-and-abuse.-kari-lake-reacts-to-1300-voice-of-amer.html.

90.     That same day, Ms. Lake sat for a televised interview on Newsmax, where she stated: "I've been disappointed by . . . what I've seen in some instances on Voice of America. The media has gone so far to the left; they've stopped being fair, neutral, and non-partisan, and they've all gone partisan, pushing an agenda."[11]

91.     In the same Newsmax interview, Ms. Lake added: "The particular problem about this agency is it's taxpayer funded and there's no oversight over the editorial side of what's going over the air.  The agency has tried to put up a . . . border wall around it that says . . . you can't tell us what we say on the airwaves. . . . That's not how things should operate."

92.     During the Newsmax interview, the interviewer remarked that, during the Second World War, VOA had "spread . . . what was *a more MAGA message* back then, an America-first message during the Second World War."  Defendant Lake responded: "Right."

93.     On March 19, 2025, Ms. Lake posted on X: "In its current form, the Voice of America is unsalvageable. . . . Let's reduce this to the bare minimum and start fresh."[12]

## V.    PLAINTIFFS HAVE SUFFERED, AND CONTINUE TO SUFFER, IRREPARABLE HARM DUE TO DEFENDANTS' REPEATED BREACHES OF THE FIREWALL AND DISMANTLING OF USAGM, AND EACH PLAINTIFF HAS STANDING TO BRING THIS ACTION

### *The VOA Journalists' Irreparable Harm*

94.     The VOA Journalists, and other employees represented by the Plaintiff Federal Employee Unions and TNG-CWA, have suffered and continue to suffer irreparable harm as a result of Defendants' conduct, including—in derogation of their rights under the First Amendment and other provisions of law—by being deprived of the ability to engage in news-

---

[11] Kari Lake, "On Monday, I joined Rob Finnerty on Newsmax to discuss my efforts to reduce the size of the agencies under my purview to the statutory minimum," Facebook (Mar. 19, 2025), https://www.facebook.com/TheKariLake/videos/on-monday-i-joined-rob-finnerty-on-newsmax-to-discuss-my-efforts-to-reduce-the-s/981078997333874/.

[12] Kari Lake (@KariLake), X (Mar. 19, 2025), https://x.com/KariLake/status/1902532400183206000.

gathering and reporting of the news, or to author and disseminate editorial works of opinion, criticism, and human interest as part of their work at VOA because of the content and perceived viewpoint of their reporting; by interfering with their exercise of editorial control; by chilling any future reporting they may publish for VOA; by being maligned and sidelined in their careers; and, in the cases of Plaintiffs John Doe 3 and John Doe 4 and others represented by the Plaintiff unions, who are foreign nationals and J-1 visa holders, by facing the prospect of having to leave the United States because the employment requirements of their visa cannot be satisfied.  Each of the VOA Journalists has worked—some of them for decades—to support and build the journalistic efforts at VOA and the other USAGM entities, but Defendants are destroying the agency entirely.  Plaintiffs' livelihoods and their careers are being harmed every day.

95.     As a result of Defendants' actions, VOA's journalism has been severely hampered.  VOA cannot continue to function as required by law when placed under these types of pressures.  And its reporters, facing serious and personal risks to their future—and for some foreign correspondents, their safety—have been and unquestionably will be chilled in their news coverage.   This is the very type of irreparable harm that the First Amendment and the statutory firewall are meant to protect against.

96.     There is further, immediate harm to USAGM programming.  Sudden interruptions in broadcasting programming results in irreversible losses to a station's audience, and the longer it is off air, the harder it is to gain the audience back.  This damage to USAGM programming directly injures the careers of all USAGM employees, as well as their mission of combatting autocracy with the free and open journalism that USAGM and its grantees' programs provide.

***RSF/RSF USA's Irreparable Harm***

97.    The shutdown of USAGM, and VOA in particular, has caused and will continue to cause irreparable harm to RSF and RSF USA as advocacy organizations, to the correspondents they represent and who affiliate with them, and to the individuals throughout the world who depend on that work and whose interests RSF and RSF USA champion.  Those irreparable harms include significantly interfering with the organizations' ability to advocate for a free press; injuring correspondents by depriving them of a trustworthy news and information in countries where VOA is one of the few, if not the only, sources of independent and reliable news; stopping them from disseminating vital information; reducing the opportunities for persecuted correspondents' stories to be highlighted and potentially protected; and preventing the public from receiving valuable information they have consistently relied upon, which at times can be a matter of life and death.  The silencing of VOA also impedes RSF and RSF USA's ability to function and force the organization to lose and waste material resources it otherwise would not have spent and upon which it relies.  Indeed, the loss of VOA would weaken RSF and RSF USA's ability to amplify press freedom concerns throughout the world. VOA is perhaps the only American media outlet with a dedicated "press freedom desk" that regularly investigates and covers stories concerning press freedom in the United States and around the world.  VOA frequently covers RSF and RSF USA's reports and advocacy efforts, ensuring that threats to journalists and media independence receive international attention.

***TNG-CWA's Irreparable Harm***

98.    TNG-CWA brings this action on behalf of its members—both those who work at RFA and have been furloughed due to the cut of RFA's grant, and have therefore been injured in the same manner as the VOA Journalists, as well as other members of TNG-CWA who work for

other media outlets and have been made less safe and seen their mission of promoting press freedoms severely damaged by the shuttering of USAGM operations.  Some TNG-CWA members employed by RFA have been especially endangered because they are present in the United States J-1 work visas, which they stand to lose if they are furloughed, and that loss will require them to uproot their lives and return to their home countries—some dangerous dictatorships where they may face serious threats of retaliation and persecution for their press freedom work at RFA—creating a serious risk of immediate harm.  For instance, the majority of RFA employees working on Cantonese language programs fled from Hong Kong when the Chinese Communist Party led a brutal crackdown on democracy advocates and journalists.  They will be targeted by the Chinese government if they are forced to return.  And more broadly, although TNG-CWA members' jobs are based in the United States and Canada, some members, such as reporters and photojournalists, report on stories that require travel to other countries, including countries where USAGM programs, such as RFA, broadcast to combat the lack of a free press, and those programs coming off-air endangers those TNG-CWA members as well.

### AFSCME's Irreparable Harm

99.     AFSCME asserts this action both on behalf of its members, who as USAGM employees have been injured in the same manner as the VOA Journalists who are full-time USAGM employees, and also as an organization harmed in its own right.  Since the administrative leave notices were sent to affected employees, the union has been flooded with emails, texts, and phone calls from affected employees and other bargaining unit members who are distraught and concerned about their livelihoods and the mission of their agency.  Affected employees have contacted the union to seek information, guidance, and explanations of their rights, including retirement rights for those of retirement age because they are not receiving any

guidance from the USAGM.  Furthermore, as a result of USAGM's attack on its employees, at least three AFSCME members have chosen to retire rather than contend with the uncertainty at USAGM, and more are considering the same path.  These retirements weaken the bargaining unit and the union, as retired members cease to pay the voluntary union membership dues that the union relies upon to provide high-quality services to members.  And if USAGM is dismantled entirely, AFSCME will not be able to provide its core services to the AFSCME bargaining unit at USAGM at all, because it will no longer exist.

***AFGE's Irreparable Harm***

100.    AFGE brings this action both in its own right and on behalf of its members. AFGE members—including several journalists, some of whom are individual plaintiffs in this matter—have suffered harm identical to that experienced by the VOA Journalists. In addition, Defendants' actions have created significant confusion, further harming AFGE members.  The threatened dismantling of USAGM jeopardizes their livelihoods and has already caused substantial stress and fear.  Members have also been forced to make critical decisions with potentially serious financial and familial consequences as a direct result of Defendants' conduct. As an organization, AFGE has suffered ongoing and irreparable harm.  AFGE and its affiliate, AFGE Local 1812, have had to divert considerable resources in recent days to address an overwhelming number of inquiries from members seeking guidance about developments at USAGM. Should USAGM be dismantled, AFGE will no longer be able to represent its members employed there and stands to lose hundreds of dues-paying members.  This will not only reduce revenues, but also irreparably diminish AFGE's bargaining position and impair its ability to carry out its mission.

*AFSA's Irreparable Harm*

101.    AFSA has already been severely harmed by Defendants' actions and will suffer continued, irreparable harm if Defendants' actions are not enjoined.  Since March 15, 2025, AFSA has devoted and will continue to devote considerable resources to responding to its members' requests and providing guidance about Defendants' gutting of USAGM.  If USAGM is dismantled, AFSA will be further harmed because it will be unable to represent its members who are USAGM FTEs.  AFSA members have been severely and irreparably harmed.  They are confused and frightened.  The dismantling of USAGM will result in AFSA members losing their livelihoods.  Several of AFSA's members are assigned to countries with critical threat concerns.  Losing access to USAGM facilities, technology, and security apparatus, as a result of being placed on administrative leave, puts their safety and well-being at risk.

## FIRST CAUSE OF ACTION

### Injunctive Relief Under the First Amendment

### (Viewpoint Discrimination and Chilling of Free Speech and Freedom of the Press)

102.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

103.    Defendants' conduct in dismantling USAGM, placing virtually the entire staff of USAGM (including VOA and Radio y Televisión Martí) on administrative leave, and shuttering USAGM's operations in preparation for a final dismantling of its programming, and ending grants to grantee organizations like RFE/RL, RFA and other government-supported outlets, violates the First Amendment by, including but not limited to: (a) unconstitutionally discriminating based on perceived viewpoint; (b) unconstitutionally chilling rights under the First

Amendment's guarantees of free speech and freedom of the press; and (c) unconstitutionally interfering with editorial discretion.

104.    The VOA Journalists and other USAGM employees represented by the Federal Employee Unions are civil servants engaged in journalistic activities entitled to First Amendment protection under the Press Clause and the Speech Clause of the First Amendment.  Defendants have deprived USAGM journalists, and their colleagues who support them in the dissemination of news and opinion, of their First Amendment rights to freedom of speech and freedom of the press by interfering in all USAGM outlets' editorial independence by ceasing agency operations and forbidding them to work.   Defendants have chilled news coverage, caused the killing of valuable news stories and opinion pieces, and engaged in a pattern and practice of dismantling the agency.

105.    By shuttering the agency, Defendants have prevented the USAGM networks and journalists from making independent decisions about what news to cover and how to cover it, in violation of the First Amendment.

106.    Defendants perceive the USAGM journalists and staff members, including the VOA Journalists, to be liberal, anti-Trump and members of the "deep state."  Defendants' efforts to interfere with the content of Plaintiffs' news coverage and to undermine the efficiency of their organizations were undertaken to limit speech on topics Defendants disagree with, punish speech expressing certain viewpoints, and chill journalistic activities.  Defendants' conduct is presumptively unconstitutional, and Defendants can offer no compelling rationale to justify it.

107.    Defendants' misconduct risks the reputation and credibility of the VOA Journalists and all USAGM employees and networks, harming journalists, chilling protected journalistic activity, and limiting all stakeholders' and journalists' futures.

108.    As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer irreparable harm.

## SECOND CAUSE OF ACTION

### Injunctive Relief Under the First Amendment

### (Violation of the Right to Receive Information)

109.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

110.    The First Amendment protects the right to receive information and ideas.  It prohibits the government from arbitrarily or vindictively limiting the stock of information from which members of the public may draw.  The public, including RSF and RSF-USA and their members, has a right to receive information from the press without undue government interference.

111.    Until Defendants' unconstitutional actions, USAGM's networks, including VOA, had provided information and published trusted reporting for more than 80 years, as it is statutorily required to do.

112.    Defendants have shuttered USAGM's networks' operations because of the content and perceived viewpoint of the networks' speech, unlawfully interfered with the editorial independence of the networks' journalists, and seek to chill the future speech of the networks' journalists.  These actions have deprived RSF and RSF-USA and their members of a valuable source of information and reporting.

113.    Defendants' actions violate RSF and RSF-USA's and their members' First Amendment right to receive information from USAGM's networks, including VOA.

114.    Defendants' actions are subject to strict scrutiny.

115.    No legitimate compelling government interest justifies Defendants' actions, and they are not the least restrictive means of achieving any legitimate governmental objective.

116.    As a result of Defendants' unconstitutional actions, RSF and RSF-USA and their members have suffered and continue to suffer irreparable harm, which warrants immediate relief.

### THIRD CAUSE OF ACTION

**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2):**

**(Defendants' Firewall Breaches Are Arbitrary, Capricious, Unconstitutional,
or Otherwise Not in Accordance With Law)**

117.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

118.    Individually and collectively, Defendants' numerous firewall violations constitute "final agency action[s] for which there is no other adequate remedy." 5 U.S.C. § 704.

119.    Under the Administrative Procedure Act, this Court is empowered to "hold unlawful and set aside agency action, findings, and conclusions found to be": (1) "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law"; (2) "contrary to constitutional right, power, privilege, or immunity"; (3) "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right"; or (4) "without observance of procedure required by law." 5 U.S.C. § 706(2).

120.    Defendant USAGM is an agency subject to the APA. 5 U.S.C. § 701; 22 U.S.C. § 6203.

121.    Defendants' firewall breaches are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Defendants' conduct infringes upon the First Amendment right to freedom of the press and the right to engage in protected First Amendment activity, and is unconstitutional discrimination based on perceived viewpoint. Defendants'

actions—including their perceived-viewpoint discrimination—are presumptively unconstitutional, and because Defendants have no legal or rational justification for their misconduct, that conduct is unconstitutional and thus violates the APA.  In fact, the *only* reasonable inference to draw from Defendants' conduct is that Defendants intended to penalize those who have a perceived viewpoint that differs from Defendants' political perspective.  Defendants' breach of the firewall—by virtue of shuttering the agency, putting all staff on administrative leave, and threating to drastically reduce staffing—also constitute an effort to chill the VOA Journalists and others' exercising of their rights under the First Amendment.

122.  Defendants' conduct is also "not in accordance with law," and is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right."  5 U.S.C. § 706(2)(A), (2)(C).  Defendants' misconduct violates the statutory firewall, which exists to protect the USAGM journalists' professional independence and integrity and to enable them to operate within the highest professional standards of broadcast journalism.  *See* 22 U.S.C. §§ 6202, 6204(b).  Defendants' conduct violates the firewall in that it seeks to strangle the networks and coerce them into submission and because it violates the statutory take care clause, which requires that Defendants "respect the professional independence and integrity of the Agency, its broadcasting services, and the grantees of the Agency."  22 U.S.C. § 6204(b).

123.  Defendants' firewall breaches are also "arbitrary and capricious."  5 U.S.C. § 706(2)(A).  Defendants' conduct is both substantively unreasonable and they have offered no legitimate rationale for their conduct and have failed to consider the interests and mission of USAGM, the networks, and their employees.  To date, Defendants' expressed rationales for their misdeeds have been either facially discriminatory or pretextual and unsupported by substantial evidence, and do not render lawful support for Defendants' unlawful conduct.

124.    Defendants' misconduct risks the reputation and credibility of the VOA Journalists and all USAGM employees and networks, harming journalists, chilling protected journalistic activity, and limiting all stakeholders' and journalists' futures.  Defendants have also directly risked Plaintiffs' livelihoods and future careers, smearing them as incompetent or, worse, as "spies" and "terrorist sympathizers."

125.    As a result of Defendants' actions, therefore, Plaintiffs have suffered and continue to suffer irreparable harm.

<u>**FOURTH CAUSE OF ACTION**</u>

**Injunctive Relief for Violation of the Statutory Firewall, 22 U.S.C. §§ 6202, 6204**

126.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

127.    In creating USAGM (and its predecessors) and its networks, Congress created a statutory firewall to protect the independence and integrity of its journalists and their reporting. Federal law provides that "United States international broadcasting shall . . . be conducted in accordance with the highest professional standards of broadcast journalism" and shall "be based on reliable information about its potential audience."   22 U.S.C. § 6202(a)(5)–(6).  In addition, "United States international broadcasting shall include . . . news which is consistently reliable and authoritative, accurate, objective, and comprehensive" and which is "a balanced and comprehensive projection of United States thought and institutions, reflecting the diversity of United States culture and society."   22 U.S.C. § 6202(b)(1)–(2).

128.    Congress recognized that, to be effective, "the Voice of America must win the attention and respect of [the] listener[]."   22 U.S.C. § 6202(c).  To meet that goal, Congress stated that VOA will "serve as a consistently reliable and authoritative source of news," and that

its news "will be accurate, objective, and comprehensive."   22 U.S.C. § 6202(c)(1).   VOA "will

represent America, not any single segment of American society, and will therefore present a

balanced and comprehensive projection of significant American thought and institutions."  22

U.S.C. § 6202(c)(2).  And when Congress created the office of the CEO, it required the CEO to

"respect the professional independence and integrity" of its broadcasting services and grantees.

22 U.S.C. § 6204(b).

129.    As officers of USAGM and its associated entities, Defendants are bound by the

statutory firewall.

130.    Defendants have egregiously, aggressively, and unabashedly violated the firewall

by interfering with and indeed preventing VOA's newsgathering and news dissemination.

Defendants have caused the killing of valuable news stories and "disappeared" editorials—and

Defendants have also directly risked Plaintiffs' livelihoods and future careers, smearing them as

incompetent or, worse, as "spies" and "terrorist sympathizers."

131.    As a result of Defendants' actions, Plaintiffs have suffered and continue to suffer

irreparable harm.

## FIFTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2):

### (Defendants' Actions in Ceasing Statutorily Mandated Functions are Arbitrary, Capricious, Unconstitutional, or Otherwise Not in Accordance with Law)

132.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above

as though fully set forth herein.

133.    Individually and collectively, Defendants' actions constitute "final agency action

for which there is no other adequate remedy."  5 U.S.C. § 704.

134.    Defendants' conduct is "not in accordance with law" and is "in excess of statutory jurisdiction, authority, or limitations."  5 U.S.C. § 706(2)(A), (C).

a.    USAGM was established by statute, with its current structure set forth in the 2017 National Defense Authorization Act. Pub. L. 114-328, 130 Stat 2000, 2549 § 1288.  In that Act, Congress mandated that the agency "shall continue to exist within the Executive branch of Government as an entity described in section 104 of title 5, United States Code."  130 Stat. 2549; 22 U.S.C. § 6203.  No subsequent act of Congress has altered USAGM's status as an independent agency in the executive branch. Shutting down the agency thus violates this statutory mandate.

b.    Defendants have violated 22 U.S.C. § 6202(c), which codifies VOA's charter.  That charter requires VOA to "serve as a consistently reliable and authoritative source of news [that is] accurate, objective, and comprehensive." 22 U.S.C.A. § 6202(c).  By taking VOA programming off the air, Defendants have violated this statutory mandate.

c.    Defendants have violated 22 U.S.C. § 6202(a), (b), which sets forth the standards and principles governing United States international broadcasting.  That provision requires U.S. international broadcasting to "be designed so as to effectively reach a significant audience," and "include news which is consistently reliable and authoritative, accurate, objective, and comprehensive," among other

things. 22 U.S.C. § 6202(a)(7), (b)(1). By taking USAGM programming off the air, Defendants have violated this statutory mandate.

d.      Defendants have violated 22 U.S.C. §§ 1465aa, 1465bb, 1465cc, which require that USAGM "provide for the open communication of information and ideas through the use of radio" and television broadcasting to Cuba. Radio and television "broadcasting to Cuba shall serve as a consistently reliable and authoritative source of accurate, objective, and comprehensive news."  By taking Office of Cuba Broadcasting programming off the air, Defendants have violated this statutory mandate.

e.      Defendants have violated 22 U.S.C. §§ 6204(a)(5), (6), 6207(f), 6208, 6215, which require the Chief Executive Officer of USAGM to "make and supervise grants" and "allocate funds appropriated for international broadcasting activities" to RFE/RL, RFA, MBN, and the Open Technology Fund.  By canceling its grant funding to these entities, Defendants have violated this statutory mandate.

f.      Defendants have violated 22 U.S.C. § 7813, which requires USAGM to "increase" broadcasts to North Korea and maintain "a goal of providing 12-hour-per-day broadcasting to North Korea, including broadcasts by Radio Free Asia and Voice of America."  By taking Voice of America programming off the air and by canceling funding to RFA, Defendants have violated this statutory mandate.

g.      Defendants have violated 22 U.S.C. § 8754(7)(A), which requires USAGM by way of VOA's Persian News Network and RFE/RL "to provide hourly live news update programming and breaking news coverage capability 24

hours a day and 7 days a week" in Iran. By taking VOA programming off the air and by cancelling funding to Radio Free Europe/Radio Liberty, Defendants have violated this statutory mandate.

h.  Defendants have violated the Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. No. 119-4, div. A, § 1101 (2025) ("2025 Continuing Resolution"), which appropriates over $857 million for USAGM to carry out international broadcasting activities "under the conditions" provided in the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (division F of the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47) ("2024 Appropriations Act"). Pub. L. No. 119-4, div. A, § 1101 (2025). The 2024 Appropriations Act in turn provides that such funds "shall be allocated" in a specified way, with certain amounts going to certain specified federal entities (such as VOA) and certain grantee organizations (such as RFE/RL). *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735 (2024); *see also id.* § 4; 170 Cong. Rec. H1501, H2089 (Mar. 22, 2024).

i.  Defendants have also violated the 2025 Continuing Resolution's prohibition, as specified in the 2024 Appropriations Act, on funds being reprogrammed such that the amounts Congress allocated to individual entities would be reduced by more than 5 percent. Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735 (2024). By terminating independent grantees' grants, and by dramatically reducing the

spending of federal entities, Defendants have greatly exceeded the 5 percent cap on funding reductions.

     j.     Defendants have also violated the 2025 Continuing Resolution's requirement that appropriated funds not be used to "suspend or eliminate a program, project, or activity" or to "close [or] . . . downsize" any "bureaus, centers, or offices" unless the agency gives the House and Senate Appropriations Committees 15 days' advance notice. *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, Sec. 7015, 138 Stat. 766. Defendants did not provide any such notice to congressional appropriations committees before suspending or eliminating broadcasts through VOA, or before closing all its offices.

135.    Defendants' actions are "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B). Defendants' conduct violates the separation of powers, including the legislature's exclusive authority to make law, U.S. Const. art. I, § 1, by unilaterally ceasing statutorily mandated functions and effectively shuttering an agency that Congress has created by statute. Defendants' conduct also violates the President's duty to "take care that the laws be faithfully executed." U.S. Const. art. II, § 3.

136.    Defendants' actions are "arbitrary and capricious." 5 U.S.C. § 706(2)(A). Defendants have given no legitimate explanation for their conduct, which constitutes a change in agency policy. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016); *FCC v. Fox Tel. Stations, Inc.*, 556 U.S. 502, 515 (2009); *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983). Defendants have failed to consider and have offered no legitimate rationale for their conduct and have failed to consider the interests and

mission of USAGM, the networks, and their employees.  To date, Defendants' expressed rationales for their misdeeds have been either facially discriminatory or pretextual and unsupported by substantial evidence, and do not render lawful support for Defendants' unlawful conduct.

## SIXTH CAUSE OF ACTION

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(1):

### Defendants Have Unreasonably Withheld Agency Action

137.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

138.    The APA provides that a reviewing court "shall" "compel agency action unlawfully withheld or unreasonably delayed[.]" 5 U.S.C. § 706(1).

139.    Defendant USAGM is an agency subject to the APA. 5 U.S.C. § 701.

140.    Individually and collectively, Defendants' actions constitute "final agency action for which there is no other adequate remedy."  5 U.S.C. § 704.

141.    By ceasing all USAGM operations, Defendants have unlawfully withheld agency action.

> a.    22 U.S.C. § 6202(c) requires Voice of America to "serve as a consistently reliable and authoritative source of news [that is] accurate, objective, and comprehensive."  By taking VOA programming off the air, Defendants have withheld mandatory agency action.
>
> b.    22 U.S.C. § 6202(a), (b) requires U.S. international broadcasting to "be designed so as to effectively reach a significant audience," and "include news which is consistently reliable and authoritative, accurate, objective, and

comprehensive," among other things.  By taking USAGM programming off the air, Defendants have withheld mandatory agency action.

c.      22 U.S.C. §§ 1465aa, 1465bb, 1465cc require that USAGM "provide for the open communication of information and ideas through the use of radio" and television broadcasting to Cuba.  Radio and television "broadcasting to Cuba shall serve as a consistently reliable and authoritative source of accurate, objective, and comprehensive news."  By taking Office of Cuba Broadcasting programming off the air, Defendants have withheld mandatory agency action.

d.      22 U.S.C. §§ 6204(a)(5), (6), 6207(f), 6208, 6215 require the Chief Executive Officer of USAGM to "make and supervise grants" and "allocate funds appropriated for international broadcasting activities" to RFE/RL, RFA, MBN, and the Open Technology Fund.  By canceling its grant funding to these entities, Defendants have withheld mandatory agency action.

e.      22 U.S.C. § 7813 requires USAGM to "increase" broadcasts to North Korea and maintain "a goal of providing 12-hour-per-day broadcasting to North Korea, including broadcasts by Radio Free Asia and Voice of America."  By taking Voice of America programming off the air and by canceling funding to RFA, Defendants have withheld mandatory agency action.

f.      22 U.S.C. § 8754(7)(A) requires USAGM by way of Voice of America's Persian News Network and RFE/RL "to provide hourly live news update programming and breaking news coverage capability 24 hours a day and 7 days a week" in Iran.  By taking Voice of America programming off the air and by

cancelling funding to RFE/RL, Defendants have withheld mandatory agency action.

g.    The 2025 Continuing Resolution appropriates over $857 million for USAGM to carry out international broadcasting activities "under the conditions" provided in the 2024 Appropriations Act, which in turn provides that such funds "shall be allocated" in a specified way, with certain amounts going to certain specified federal entities (such as VOA) and certain grantee organizations (such as RFE/RL). *See* Further Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138 Stat. 460, 735 (2024); Department of State, Foreign Operations, and Related Programs Appropriations Act, 2024 (division F of the Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47), Pub. L. No. 119-4, div. A, § 1101 (2025). By failing to allocate the appropriated funds as directed by Congress, Defendants have withheld mandatory agency action.

## SEVENTH CAUSE OF ACTION

**Mandamus Act, 28 U.S.C. § 1361; All Writs Act, 28 U.S.C. § 1651**

142.    Plaintiffs repeat, reallege, and incorporate the allegations in the paragraphs above as though fully set forth herein.

143.    The Mandamus Act, 28 U.S.C. § 1361, vests this Court with original jurisdiction over "any action in the nature of mandamus to compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff."

144.    The All Writs Act, 28 U.S.C. § 1651, authorizes this Court to issue all writs "necessary or appropriate" in aid of its jurisdiction.

145.    USAGM has a non-discretionary duty to perform various statutory functions, including:

a.     22 U.S.C. § 6202(c), which requires Voice of America to "serve as a consistently reliable and authoritative source of news [that is] accurate, objective, and comprehensive."

b.     22 U.S.C. § 6202(a), (b), which requires U.S. international broadcasting to "be designed so as to effectively reach a significant audience," and "include news which is consistently reliable and authoritative, accurate, objective, and comprehensive," among other things.

c.     22 U.S.C. §§ 1465aa, 1465bb, 1465cc, which require that USAGM "provide for the open communication of information and ideas through the use of radio" and television broadcasting to Cuba. Radio and television "broadcasting to Cuba shall serve as a consistently reliable and authoritative source of accurate, objective, and comprehensive news."

d.     22 U.S.C. §§ 6204(a)(5), (6), 6207(f), 6208, 6215, which require the Chief Executive Officer of USAGM to "make and supervise grants" and "allocate funds appropriated for international broadcasting activities" to RFE/RL, RFA, MBN, and the Open Technology Fund.

e.     22 U.S.C. § 7813, which requires USAGM to "increase" broadcasts to North Korea and maintain "a goal of providing 12-hour-per-day broadcasting to North Korea, including broadcasts by Radio Free Asia and Voice of America."

f.     22 U.S.C. § 8754(7)(A), which requires USAGM by way of Voice of America's Persian News Network and RFE/RL "to provide hourly live news

update programming and breaking news coverage capability 24 hours a day and 7

days a week" in Iran.

g.    The 2025 Continuing Resolution, which appropriates over $875 million

for USAGM to carry out international broadcasting activities "under the

conditions" provided in the 2024 Appropriations Act, which in turn provides that

such funds "shall be allocated" in a specified way, with certain amounts going to

certain specified federal entities (such as Voice of America) and certain grantee

organizations (such as Radio Free Europe/Radio Liberty). *See* Further

Consolidated Appropriations Act of 2024, Pub. L. No. 118-47, div. F, tit. I, 138

Stat. 460, 735 (2024); Department of State, Foreign Operations, and Related

Programs Appropriations Act, 2024 (division F of the Further Consolidated

Appropriations Act, 2024, Pub. L. No. 118-47), Pub. L. No. 119-4, div. A, § 1101

(2025).

146.    USAGM is not currently performing these statutorily mandated functions.

147.    It is necessary and appropriate for this Court to issue a writ of mandamus pursuant

to 28 U.S.C. §§ 1361 and 1651 and under this Court's equitable authority to compel Defendants

to act.

## EIGHTH CAUSE OF ACTION

### Violation of the Separation of Powers/*Ultra Vires*

148.    Plaintiffs have an implied right of action under the Constitution to challenge

governmental action that violates the separation of powers. *Free Enter. Fund v. Pub. Co. Acct.*

*Oversight Bd.*, 561 U.S. 477, 491 n.2 (2010).

149.    The power to make law resides exclusively with the legislative branch. U.S. Const. art. I, § 1.

150.    The Constitution vests executive power in the President, U.S. Const., art. II, and imposes on the President a duty to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3.

151.    The President and Executive Branch have no constitutional power to unilaterally enact, amend, or repeal parts of duly enacted statutes. *Clinton v. City of New York*, 524 U.S. 417, 438-39 (1998).

152.    Congress exercised its Article I legislative authority to create the USAGM as an independent executive agency.  Congress has also exercised its Article I legislative authority to mandate the USAGM carry out specific functions.  Defendants' actions unlawfully usurp Congress's legislative authority and are therefore *ultra vires*.  Defendants' actions override direct Congressional mandates, including each of the following:

  a.    22 U.S.C. § 6203, which establishes USAGM as an independent executive agency.

  b.    22 U.S.C. § 6202(c), which requires Voice of America to "serve as a consistently reliable and authoritative source of news [that is] accurate, objective, and comprehensive."

  c.    22 U.S.C. § 6202(a), (b), which requires U.S. international broadcasting to "be designed so as to effectively reach a significant audience," and "include news

which is consistently reliable and authoritative, accurate, objective, and comprehensive," among other things.

d.      22 U.S.C. §§ 1465aa, 1465bb, 1465cc, which require that USAGM "provide for the open communication of information and ideas through the use of radio" and television broadcasting to Cuba.  Radio and television "broadcasting to Cuba shall serve as a consistently reliable and authoritative source of accurate, objective, and comprehensive news."

e.      22 U.S.C. §§ 6204(a)(5), (6), 6207(f), 6208, 6215, which require the Chief Executive Officer of USAGM to "make and supervise grants" and "allocate funds appropriated for international broadcasting activities" to RFE/RL, RFA, MBN, and the Open Technology Fund.

f.      22 U.S.C. § 7813, which requires USAGM to "increase" broadcasts to North Korea and maintain "a goal of providing 12-hour-per-day broadcasting to North Korea, including broadcasts by Radio Free Asia and Voice of America."

g.      22 U.S.C. § 8754(7)(A), which requires USAGM by way of Voice of America's Persian News Network and RFE/RL "to provide hourly live news update programming and breaking news coverage capability 24 hours a day and 7 days a week" in Iran.

h.      The 2025 Continuing Resolution, which appropriates over $857 million for USAGM to carry out international broadcasting activities "under the

conditions" provided in the 2024 Appropriations Act, which in turn provides that such funds "shall be allocated" in specified amounts to specified entities.

i.      The 2025 Continuing Resolution's prohibition, as specified in the 2024 Appropriations Act, on reprogramming funds such that the amounts Congress allocated to individual entities would be reduced by more than 5 percent.

j.      The 2025 Continuing Resolution's requirement that appropriated funds not be used to "suspend or eliminate a program, project, or activity" or to "close [or] . . . downsize" any "bureaus, centers, or offices" unless the agency gives the House and Senate Appropriations Committees 15 days' advance notice.

153.    Therefore, Defendants' actions were taken without legal authority and are *ultra vires*.

## NINTH CAUSE OF ACTION

### Violation of the Appointments Clause/*Ultra Vires*

154.    Plaintiffs have an implied right of action under the Constitution to challenge governmental action that violates the Appointments Clause.  *Free Enter. Fund*, 561 U.S. at 491 n.2.

155.    The President must obtain "the Advice and Consent of the Senate" before appointing "Officers of the United States."  U.S. Const. art. II § 2, cl. 2. 42.

156.    "The Appointments Clause prescribes the exclusive means of appointing 'Officers.'"  *Lucia v. Sec. & Exch. Comm'n*, 585 U.S. 237, 244 (2018).

157.    The Chief Executive Officer of USAGM is a principal officer of the United States requiring Senate confirmation.  22 U.S.C. § 6203(b)(1).

158.    Defendant Lake claims to be acting under authority delegated to her by Defendant Morales, the acting USAGM Chief Executive Officer.  But Defendant Lake assumed her role as "special adviser" before Morales's elevation to acting Chief Executive Officer. Moreover, Defendant Lake announced Morales's selection.  Lake is acting as the de facto Chief Executive Officer of USAGM.

159.    Defendant Lake is therefore purporting to exercise the authority of the USAGM Chief Executive Officer without Presidential appointment or Senate confirmation.

160.    Lake's actions were taken without legal authority and are *ultra vires*.

# PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court enter each of the following forms of relief:

a.      Issue a preliminary and permanent injunction to:

      i.   Order Defendants to take all necessary steps to return USAGM and its employees, contractors, and grantees to their status prior to the March 14, 2025 Executive Order entitled "Continuing the Reduction of the Federal Bureaucracy" and the March 15 email issued to all VOA staff, including by reinstating and permitting employees or contractors that were placed on leave, furloughed, terminated, experienced a reduction-in-force, or had their contracts changed, canceled or modified on or after March 14, 2025 to return to work, and to take no further action to reduce USAGM's workforce (whether employees, contractors, or grantees); and

     ii.  Order Defendants to comply with Congressional statutes that require VOA to "serve as a consistently reliable and authoritative source of news," 22 U.S.C.A. § 6202(c), and require international USAGM outlets to "provide news which is consistently reliable and authoritative, accurate, objective, and comprehensive," 22 U.S.C. § 6202(a), (b) (and, similarly, 22 U.S.C. § 1465aa), including by: (i) enjoining Defendants, and those acting in concert with them, from taking take any steps that would cause USAGM or its outlets to be unable to effectively disseminate news and opinion to a significant audience, including by taking any USAGM outlet off the air; (ii) directing that Defendants restore all programming on USAGM and USAGM-grantee media outlets ; (iii) directing that Defendants shall

continue to make and supervise grants and allocate funds for international broadcasting to Radio Free Europe/Radio Liberty, Radio Free Asia, Radio Free Afghanistan and the Open Technology Fund; and (iv) directing that Defendants refrain from reducing USAGM's workforce (whether employees, PSCs, or grantees) whether by leave, furloughs, termination, reduction-in-force, cancelation of grants or contracts, or otherwise.

b.    Declare that Defendants violated the First Amendment and statutory firewall, separation of powers, the Administrative Procedure Act, and the appointments clause;

c.    Order Defendants to cease their violations of Plaintiffs' First Amendment rights;

d.    Award Plaintiffs nominal damages;

e.    Award Plaintiffs reasonable attorneys' fees and costs; and

f.    Grant such other relief as this Court deems just and proper.

Dated:        March 21, 2025

GOVERNMENT ACCOUNTABILITY
PROJECT

_____/s/_____
David Z. Seide
1612 K Street, NW
Washington, DC 20006
(202) 457-0034
davids@whistleblower.org

*Counsel for Plaintiffs Patsy Widakuswara,
Jessica Jerreat, Kathryn Neeper, John Doe
1, John Doe 2, John Doe 3, and John Doe 4*

AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL
EMPLOYEES, AFL-CIO (AFSCME)

_____/s/_____
Teague Paterson
Matthew Blumin*
Georgina Yeomans*
1625 L Street, N.W.
Washington, D.C. 20036
(202) 775-5900
TPaterson@afscme.org
MBlumin@afscme.org
GYeomans@afscme.org

*Counsel for Plaintiff American Federation
of State, County, and Municipal Employees,
AFL-CIO (AFSCME)*

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

_____/s/_____
Andrew G. Celli, Jr.
Debra L. Greenberger
Daniel M. Eisenberg
Nick Bourland
One Rockefeller Plaza, 8th Floor
New York, New York 10020
(212) 763-5000
acelli@ecbawm.com
dgreenberger@ecbawm.com
deisenberg@ecbawm.com
nbourland@ecbawm.com

*Counsel for Plaintiffs Patsy Widakuswara,
Jessica Jerreat, Kathryn Neeper, John Doe
1, John Doe 2, John Doe 3, John Doe 4,
American Federation of State, County and
Municipal Employees (AFSCME); American
Federation of Government Employees
(AFGE); American Foreign Service
Association (AFSA); and the NewsGuild-
CWA*

AMERICAN FOREIGN SERVICE
ASSOCIATION

_____/s/_____
Sharon Papp*
Raeka Safai*
2101 E Street, N.W.
Washington, D.C. 20037
(202) 338-4045
papp@afsa.org
safai@afsa.org

*Counsel for Plaintiff American Foreign
Service Association (AFSA)*

AMERICAN FEDERATION OF
GOVERNMENT EMPLOYEES, AFL-CIO

_____/s/_____

Rushab Sanghvi*
80 F. Street, NW
Washington, DC 20001
(202) 639-6424
SanghR@afge.org

*Counsel for American Federation of
Government Employees, AFL-CIO (AFGE).*

DEMOCRACY FORWARD
FOUNDATION

_____/s/_____

Kristin Bateman*
Robin F. Thurston*
Skye L. Perryman*
P.O. Box 34553
Washington, DC 20043
(202) 448-9090
kbateman@democracyforward.org
rthurston@democracyforward.org
sperryman@democracyforward.org

*Counsel for Plaintiffs American Federation
of State, County and Municipal Employees
(AFSCME); American Federation of
Government Employees (AFGE); American
Foreign Service Association (AFSA); and
the NewsGuild-CWA*

STATE DEMOCRACY DEFENDERS
FUND

_____/s/_____

Norman L. Eisen*
Joshua Kolb*
600 Pennsylvania Avenue SE #15180
Washington, DC 20003
Norman@statedemocracydefenders.org
Joshua@statedemocracydefenders.org

*Counsel for Reporters Sans Frontières,
Reporters Without Borders, Inc., American
Federation of State, County and Municipal
Employees (AFSCME); and American
Federation of Government Employees
(AFGE)*

**Pro hac vice* application forthcoming