# Exhibit A

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

**RFE/RL, INC.**,

    *Plaintiff*,

**v.**

**KARI LAKE**, in her official capacity as Senior Advisor to the Acting CEO of the United States Agency for Global Media, *et al.*,

    *Defendants*.

Case No. 1:25-cv-799-RCL

## ORDER

    Plaintiff RFE/RL, Inc. ("RFE/RL"), commonly known as Radio Free Europe/Radio Liberty, is a nonprofit news organization that provides reporting to twenty-three countries across Europe, Central and South Asia, and the Middle East. For decades, RFE/RL has been funded almost entirely via grant agreements with the defendant agency, United States Agency for Global Media ("USAGM").

    RFE/RL is historically known for radio broadcasting behind the Iron Curtain during the Cold War, with its first broadcast taking place on July 4, 1950, airing from a studio in New York City to communist Czechoslovakia. History, U.S. AGENCY FOR GLOBAL MEDIA, https://www.usagm.gov/who-we-are/history/ [https://perma.cc/27Y5-A8CP]. Originally, RFE/RL was funded by the Central Intelligence Agency. Our History, RADIO FREE EUROPE/RADIO LIBERTY, https://about.rferl.org/our-history/ [https://perma.cc/U7AB-77BA]. In 1973, Congress formally established funding for RFE/RL in the International Broadcasting Act, in which Congress

1

found that "Radio Free Europe and Radio Liberty"[1] "have demonstrated their effectiveness in furthering the open communication of information and ideas in Eastern Europe and the Union of Soviet Socialist Republics." Pub. Law No. 93-129, 87 Stat. 457. From this passage onward, Congress has appropriated funding for RFE/EL every year. *See* Declaration of Stephen Capus, CEO of RFE/RL, ¶¶ 4–6 ("Capus Decl."), ECF No. 6-3.

In 1994, the International Broadcasting Act was amended to create the Broadcasting Board of Governors (BBG)—USAGM's predecessor. The statute's purpose was to "promote the right of freedom of opinion and expression" and to "reorganiz[e] and consolidat[e] . . . United States international broadcasting" to "support freedom and democracy," especially in places like "the People's Republic of China and other countries of Asia which lack adequate sources of free information." 22 U.S.C. § 6201. In 1998, BBG assumed oversight of RFE/RL. History, U.S. AGENCY FOR GLOBAL MEDIA, https://www.usagm.gov/who-we-are/history/ [https://perma.cc/27Y5-A8CP]. In 2018, as part of a larger modernization effort, BBG changed its name to "United States Agency for Global Media," as it is now known. *Id.* Today, in addition to RFE/RL, USAGM oversees several other entities, including two broadcasting networks operated by the federal government—the Voice of America and the Office of Cuba Broadcasting— and four independent nonprofit organizations—Radio Free Asia, the Middle East Broadcasting Networks, the Open Technology Fund, the Frontline Media Fund. *See* Organizational Chart, U.S. AGENCY FOR GLOBAL MEDIA (Nov. 7, 2024), https://www.usagm.gov/who-we-are/organizational-chart/ [https://perma.cc/4K9J-4H6P].

On March 14, 2025, President Trump announced Executive Order 14238, "Continuing the Reduction of the Federal Bureaucracy," which purports to eliminate "non-statutory components

---

[1] RFE and RL combined to form a single corporate entity, RFE/RL, in 1976.

2

and functions" of USAGM "to the maximum extent consistent with applicable law." Exec. Order 14238, "Continuing the Reduction of the Federal Bureaucracy" (Mar. 14, 2025), https://www.whitehouse.gov/presidential-actions/2025/03/continuing-the-reduction-of-the-federal-bureaucracy/ [https://perma.cc/J4WD-Q2UU]. The next day, on March 15, RFE/RL received a letter from USAGM terminating RFE/RL's grant agreements, stating that RFE/RL "no longer effectuates agency priorities" and citing the President's Executive Order directing that USAGM eliminate all "non-statutorily required" activities and functions. Termination Letter, Ex. 1, ECF No. 6-3. The letter also instructed RFE/RL to "discharge [] closeout responsibilities as set forth in 2 C.F.R. § 200.344-46." *Id.*

On March 19, 2025, RFE/RL moved for a temporary restraining order ("TRO"),[2] seeking immediate disbursement of $7,464,559 in congressionally appropriated funds for the period of March 1–14, 2025 and an order enjoining implementation of the termination letter. *See* Mot. for TRO, ECF No. 6. The defendants filed an Opposition, *see* Resp. to Mot. for TRO ("Opp'n"), ECF No. 9, and RFE/RL filed a Reply, *see* Repl. to Opp'n ("Reply"), ECF No. 11.

On Monday, March 24, 2025, shortly before the scheduled hearing on the TRO motion, the defendants filed a "Notice of Disbursement Initiation." *See* Notice, ECF No. 13. The Notice attaches a letter from the Chief Financial Officer of USAGM that reads:

> The agency has taken immediate administrative steps to initiate the disbursement of an amount totaling $7,464,559. Given the mechanics of the Treasury process, we believe that the payment will be in their system by March 26, 2025. We expect to provide Proof of Payment by March 26, 2025. Actual disbursement to Radio Free Europe/Radio Liberty will occur within a week from today's date.

---

[2] In this lawsuit, RFE/RL has moved for two forms of preliminary relief: 1) a TRO, which is the motion at issue in the instant Order, and 2) a preliminary injunction, which would order USAGM to effectuate further grant agreements with RFE/RL to disburse congressionally appropriated funds through September 30, 2025. *See* Mot. for TRO and PI, ECF No. 6. However, the parties have only briefed the TRO, and the TRO was the subject of the March 24, 2025 hearing before the Court. The Court takes no position on the pending PI and will rule on that motion when the matter has been fully briefed.

3

*Id.*, Ex. A. At the hearing, RFE/RL argued that even though USAGM had demonstrated an intent to disburse the outstanding funds for the March 1–14 period, there remained an immediate need for injunctive relief. Under the terms of the termination letter, USAGM directed RFE/RL to "discharge" its "closeout responsibilities" under the relevant regulations. Termination Letter, Ex. 1, ECF No. 6-3. And according to those regulations, RFE/RL "must liquidate all financial obligations incurred under the Federal award no later than 120 calendar days after the conclusion of the period of performance [i.e., March 15, 2025]." 2 C.F.R. § 200.344(c). The liquidation process, according to the termination notice and the pertinent regulations, must begin right away. *See id.* § 200.472(a)(2) ("Any [closeout] costs continuing after termination due to the negligent or willful failure of the recipient or subrecipient [of a federal award or grant] to immediately discontinue the costs are unallowable."). Thus, with the instant TRO, RFE/RL seeks to suspend the grant closeout process detailed in the termination letter.

## I. LEGAL STANDARD

A TRO should be granted if the movant meets its burden to show that 1) the movant is likely to succeed on the merits; 2) the movant is likely to suffer irreparable harm unless preliminary relief is granted; 3) the balance of the equities favors a TRO or preliminary injunction; and 4) a TRO is in the public interest. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Courts in this Circuit have adopted a sliding scale approach to the TRO analysis, whereby a relatively strong showing on one of these factors may partially offset weakness in another, although some non-speculative showing of irreparable harm is essential. *CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995). Where, as here, the government is a party, the latter two factors of the preliminary analysis merge into one, because the interest of the government is taken to be identical to the interest of the public. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

## II. DISCUSSION

### A. RFE/RL is Likely to Succeed on the Merits of its APA Claim

RFE/RL brings several claims, including an alleged violation of APA, alleged violations of various provisions of the Constitution (including the Appropriations and Spending Clauses, the Presentment Clause, the Take Care Clause, and separation-of-powers principles), a request for mandamus relief, and an ultra vires claim. The Court concludes that RFE/RL demonstrates a likelihood of success on the merits on its APA claim, and for the purposes of granting the instant TRO motion, the Court takes no position on the remaining claims.

The APA permits judicial review of "final agency action" and requires a court to "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §§ 704, 706(2)(A). To constitute final agency action: (1) "the action must mark the consummation of the agency's decisionmaking process" and (2) it "must be one by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997).

Here, the final agency action that RFE/RL challenges is USAGM's termination letter imposing closeout responsibilities on RFE/RL, which it is to undertake "immediately." 2 C.F.R. § 200.472(a)(2). The Court has no trouble concluding this is a "final" agency action given the unambiguous language of the grant termination letter—USAGM has taken a firm position that all grants are terminated, and RFE/RL must begin closeout procedures. Moreover, the Executive Order seems to afford little play in the joints for USAGM to reverse course on this decision, absent a judicial determination that ordering such closeout procedures is not consistent with applicable law.

5

RFE/RL argues that the defendants' action was arbitrary and capricious.  An agency has a duty to "examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Ark Initiative v. Tidwell*, 816 F.3d 119, 127 (D.C. Cir. 2016) (internal quotation marks omitted) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983)).  Thus, "an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.* (alteration in original) (quoting *State Farm*, 463 U.S. at 43).  Here, the "explanation" offered by USAGM can scarcely be characterized as an explanation: it amounted to one line in the termination letter stating that "the award no longer effectuates agency priorities."  Termination Letter, Ex. 1, ECF No. 6-3.  This conclusory statement, unsupported by any facts or reasoning, is not a "satisfactory explanation" and offers no "rational connection between the facts found and the choices made."

In short, RFE/RL has identified a final action by USAGM and has shown a likelihood of success on the merits of its claim that in taking this action, the defendants have acted arbitrarily and capriciously.  The first TRO factor is therefore satisfied.

### B. The Remaining TRO Factors Favor RFE/RL

The latter three TRO factors are: whether the movant is likely to suffer irreparable harm; whether the balance of the equities favors a TRO; and whether a TRO is in the public interest. *Winter*, 555 U.S. at 20.  All three factors favor RFE/RL.

RFE/RL has demonstrated that irreparable harm will follow if its TRO request is denied. To demonstrate irreparable harm, the moving party must satisfy two requirements. "First, the harm

6

must be 'certain and great,' 'actual and not theoretical,' and so 'imminen[t] that there is a clear and present need for equitable relief to prevent irreparable harm.'" *League of Women Voters of United States v. Newby*, 838 F.3d 1, 7–8 (D.C. Cir. 2016) (alteration in original) (quoting *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006)). "Second, the harm 'must be beyond remediation.'" *Id.* at 8 (quoting *Chaplaincy of Full Gospel Churches*, 454 F.3d at 297).

The Court concludes that the government's disbursement of the nearly $7.5 million in funds to RFE/RL does not mitigate RFE/RL's showing of irreparable harm. In order to abide by the terms of the termination letter, RFE/RL would have to *immediately* halt all use of appropriated funds insofar as those funds are used to satisfy "financial obligations incurred under the Federal award." 2 C.F.R. § 200.344(c). And immediately halting the use of funds that have just been distributed is the functional equivalent of not receiving them at all. RFE/RL would be forced to break lease agreements, terminate employment contracts—thus destroying the credibility RFE/RL has built over decades—and cease all other operations. "While ordinary economic injuries are usually insufficient to require injunctive relief, financial harm can 'constitute irreparable harm . . . where the loss threatens the very existence of the movant's business.'" *Climate United Fund v. Citibank, N.A.*, No. 25-cv-698 (TSC), 2025 WL 842360, at *10 (D.D.C. Mar. 18, 2025) (quoting *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985)). Abiding by the termination letter would, inevitably, result in the complete shuttering of the plaintiff's business—and the shuttering process is already underway. *See* Capus Decl. ¶¶ 4–6.

In short, the termination letter appears to require RFE/RL to initiate its closeout obligations under several federal regulations. Although the government suggested at the motions hearing that RFE/RL has 120 days to comply with those closeout obligations, *see* 2 C.F.R. § 200.344(c), the

7

accompanying regulation referenced in the termination letter plainly disallows incurrence of "[a]ny cost" after the effective termination date of March 15, 2025, *see* 2 CFR § 200.472(a)(2).  RFE/RL therefore construes the prohibition of spending on "any costs" as effectuating a complete bar on spending the to-be-disbursed $7.5 million.  Practically, this puts RFE/RL in the same position as if they had not received the funds at all, RFE/RL has already demonstrated the irreparable harms that would flow from not receiving the funds.  The Court therefore concludes that RFE/RL has demonstrated that irreparable harm will ensue in the absence of a TRO.

Regarding the final two TRO factors, the balance of the equities and the public interest favor RFE/RL.  These factors "merge when the government is the opposing party." *Am. Ass'n of Pol. Consultants*, 613 F. Supp. 3d at 365 (quoting *Nken*, 556 U.S. at 435).  "There is a substantial public interest 'in having governmental agencies abide by the federal laws that govern their existence and operations,'" *Newby*, 838 F.3d at 12 (citation omitted), and as explained *supra*, the Court concludes that USAGM is likely in violation of the APA.  Furthermore, Congress has enshrined into law that "[i]t is in the interest of the United States to support broadcasting to other nations." International Broadcasting Act, 22 U.S.C. § 6201(3).

For the last seventy-five years, our government has specifically supported RFE/RL as the entity through which it has carried out this mission.  Indeed, RFE/RL was originally conceived of in the 1950s as a vehicle for providing trustworthy, locally relevant news to audiences subject to communist propaganda.  Capus Decl. ¶¶ 4–6.  Since its inception, RFE/RL has continued to expand, responding to threats to democracy and media freedom across the globe.  *Id.* ¶ 7.  And today, RFE/RL serves as a multi-faceted news outlet, with an online and social media presence, providing reporting in nearly thirty different languages to twenty-three countries across the globe and reaching 47 million people every week.  *Id.* ¶¶ 3, 7, 8; *see also* RFE/RL Fact Sheet, U.S.

8

AGENCY FOR GLOBAL MEDIA (Jan. 7, 2025).[3]  The Court concludes, in keeping with Congress's longstanding determination, that the continued operation of RFE/RL is in the public interest.

## III.  CONCLUSION

Congress has found that "it is the policy of the United States to promote the right of freedom of opinion and expression" and that "open communication of information and ideas among the peoples of the world contributes to international peace and stability."  International Broadcasting Act of 1973, 87 Stat. at 457.  RFE/RL has, for decades, operated as one of the organizations that Congress has statutorily designated to carry out this policy.  The leadership of USAGM cannot, with one sentence of reasoning offering virtually no explanation, force RFE/RL to shut down—even if the President has told them to do so.

Therefore, upon consideration of the plaintiff's Motion [ECF No. 6] for a Temporary Restraining Order, the defendants' Opposition thereto, the plaintiff's Reply, and the entire record herein, it is hereby

**ORDERED** that the plaintiff's Motion for a Temporary Restraining Order is **GRANTED**; and it is further

**ORDERED** that the portion of the plaintiff's TRO motion seeking disbursement of $7,464,559 for the March 1–14 period of performance is now **MOOT** given the defendants' notice of disbursement initiation for that outstanding amount; and it is further

**ORDERED** that the defendants and their agents take no steps and impose no obligations relating to closing out the plaintiff's grant; and it is further

---

[3] https://www.usagm.gov/wp-content/uploads/2025/01/USAGM-RFERL-OneSheet-01-07-25.pdf [https://perma.cc/ZCG4-HHDY].

9

**ORDERED** that the parties abide by the following briefing schedule for the briefing of the preliminary injunction:

> Defendants' Opposition: due Wednesday, March 26, 2025
>
> Plaintiff's Reply: due Friday, March 28, 2025.

The Court intends to rule on the preliminary injunction motion expeditiously.

**IT IS SO ORDERED.**

Date: March 25, 2025
3:00 p.m.

Royce C. Lamberth
United States District Judge